Judith B. REAP, individually and on
behalf of all persons similarly
situated, Plaintiff,

v.

CONTINENTAL CASUALTY COMPANY
d/b/a CNA Insurance Companies,
Defendant.

Civ.A. No. 99–1239(MLC).

United States District Court,
D. New Jersey.

March 21, 2001.

Richard M. Schall, Patricia M. Barasch, Schall & Barasch, LLC, Moorestown, NJ, Alan B. Epstein, pro hac vice, Spector Gadon & Rosen, P.C., Philadelphia, PA, for Plaintiff.

Mark Diana, Robin H. Rome, Stanton, Hughes, Diana, Cerra, Mariani & Margello, P.C., Morristown, NJ, Anne G. Kimball, John F. Kuenstler, pro hac vice, Wildman, Harrold, Allen & Dixon, Chicago, IL, for Defendant.

## MEMORANDUM OPINION

COOPER, District Judge.

This matter comes before the Court on the motion of individual plaintiff Judith B. Reap ("Reap") for class certification of this case pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) or (b)(3). Reap argues that the policy of defendant Continental In-

surance Company d/b/a CNA Insurance Companies ("CNA") of delegating discretionary authority to subordinate managers and supervisors to make employment decisions, such as hiring, assignment, promotion, transfer, performance, salary, and discipline, without sufficient oversight, gives rise to common questions of fact that warrants certification of the proposed company-wide class. Reap argues that this policy allows CNA managers and supervisors to improperly use gender and age as criteria in decisions relating to the conditions of employment of women, and particularly older women, in higher job classifications in its workforce.

CNA, on the other hand, argues that class certification is improper because: (1) Reap has presented no evidence that she or the class she seeks to represent was subjected to a common set of discriminatory employment practices or policies; (2) the claims asserted by Reap, individually and on behalf of the class, raise numerous individual questions that are not amenable to generalized proof; (3) Reap is an inadequate class representative because her claims and class definition put her in conflict with other putative class members whom she supervised, and younger women who allegedly benefitted from the age discrimination by which she claims to have been victimized; and (4) the 1991 amendment to Title VII makes class certification inappropriate because (a) the availability of attorneys fees to successful plaintiffs provides an incentive for plaintiffs to control their own litigation, and (b) the availability of damages means that the individualized nature of proof required to prove damages will predominate over any questions of law or fact common to members of the class. For the reasons expressed below, Reap's motion for class certification will be denied.

## BACKGROUND

### A. *The Organization of CNA*

CNA is one of a group of commonly-owned insurance companies that do business throughout the world using the "CNA" service mark. (Aff. of Judith Samuel filed 6–9–00 ("Samuel Aff.") ¶ 2.) CNA employs approximately 18,000 employees in over 284 separate offices throughout the United States, with an additional 43 offices located throughout the rest of the world. (*Id.* ¶ 4.) CNA has facilities and employees in each of the fifty states. (*Id.*)

CNA has adopted a structure based on eight separate Strategic Business Units ("SBUs"), which focus on the different products CNA offers. (*Id.* ¶ 5.) Each SBU maintains a separate reporting structure under which employees report up a chain of command to the SBU head. (*Id.* ¶ 7.) Most SBUs have operations at several different locations throughout the country. (*Id.*) Each SBU makes independent decisions regarding the structure, management, and direction of its business. (*Id.*)

CNA as a whole and each SBU has a variety of grade levels associated with the many and varied jobs that must be performed in its organization. (*Id.* ¶ 8.) Generally, jobs below grade 30 are clerical and subject to the provisions of the Fair Labor Standards Act. (*Id.*) Jobs above grade 30 include supervisors, managers, directors, and officers. (*Id.*) These management functions differ significantly from others in level and focus of responsibility. (*Id.*) The expectations for each position also differ depending on the SBU to which the position is assigned. (*Id.*) Officer level positions (grade 91 and above) are treated differently in terms of performance expectations, goals, and compensation. (*Id.*)

CNA's Human Resources function has adopted a uniform set of core personnel policies governing performance review, salary increases, job posting, discipline, termination, and other basic employment policies. (*Id.* ¶ 10 & Ex. 1: Human Resources Manual dated 7–15–95; Aff. of Mark Diana in Opp'n to Pl.'s Mot. for Class Certification ("Diana Aff.") Ex. 10: Excerpts of Dep. Tr. of Judith Samuel dated 10–25–99 ("Samuel dep.") at 17–18, Ex. 5: Exempt Performance Review dated 10–27–97.) These policies prohibit discrimination on the basis of age or gender. (Samuel Aff. ¶ 10 & Ex. 1 Procedure 1500.) Decisions affecting hiring, promotion, salary, benefits, and termination of CNA's employees are made by individual officers, directors, managers, and supervisors at the local level.

(Samuel dep. at 26, 34–35, 37–38, 47–50, 71–72; Samuel Aff. ¶ 11–14.)

### B. *Reap's Work History*

Reap, a member of the bar of the Commonwealth of Pennsylvania, was born on August 3, 1941 and is currently 59 years old. (Compl. ¶ 9.) Reap began working for CNA on June 29, 1992 as a Director of its Environmental Claims Department (the "ECD") in Cranbury, New Jersey. (*Id.* ¶ 18.) When CNA merged with CNA Financial Corporation in May, 1995, the Environmental Claims units of both companies were united, and Reap became Director of the Special Litigation Unit of the new ECD of the merged company. (*Id.* ¶ 19.)

During the entirety of her employment at CNA, Reap worked in the Cranbury office and was supervised exclusively in Cranbury. (Diana Aff. Ex. 9: Excerpts of Dep. Tr. of Judith B. Reap dated 9–8–99 & 9–11–99 ("Reap dep.") at 36–45, 342–343.) Decisions concerning Reap's employment, such as her hiring, performance ratings, and termination, were made by her immediate and/or next level supervisors in the ECD. (*Id.* 36–45, 117–19, 135–36.)

Reap sought promotion to the position of Assistant Vice President of the ECD. (Compl. ¶ 20.) A male employee younger than Reap obtained the Assistant Vice President position. (*Id.* ¶ 22.) Reap then sought promotion to the position of Vice President of the Environmental Claims Division. (*Id.* ¶ 23.) Although Reap alleges in the complaint that a male employee twenty years younger than Reap obtained the Vice President position, she admitted during her deposition that the person who received the job, Thomas Aries, is only four years younger than her. (*Id.* ¶ 24; Reap dep. at 131.)

Reap filed a charge of discrimination ("Charge 1") with the Equal Employment Opportunity Commission ("EEOC") and the New Jersey Division on Civil Rights ("NJDCR") in January 1996 in response to not receiving either of the promotions for which she had applied. (Compl. ¶ 25; Certif. of Mark Diana, Esq. in Supp. of Mot. to Dismiss filed 8–16–99 ("Diana Certif.") Ex. 2: Charge of Discrimination dated 6–26–96.)

Members of CNA's management staff allegedly retaliated against Reap by *inter alia* criticizing her and her staff, prohibiting her participation in important seminars and educational events, finding fault with Reap's performance, evaluating Reap's work as "not meeting acceptable minimum standards," and placing Reap on probation with the express threat of termination. (Compl. ¶¶ 27, 28.)

CNA terminated Reap from her employment on May 18, 1998. (*Id.* ¶ 29.) Although Reap alleges in the complaint that a significantly younger male assumed Reap's position, she admitted during her deposition that she was replaced by a woman, Leticia Diaz. (Compl. ¶ 30; Reap dep. at 155.) Reap then filed a second charge of discrimination ("Charge 2") with the EEOC and NJDCR in May 1998 alleging that her termination was discriminatory and in retaliation for her filing Charge 1. (Diana Certif. Ex. 8: Charge of Discrimination dated 5–28–98.) On December 18, 1998, the EEOC dismissed Charge 1, determining that its investigation did not establish a violation of Title VII or the ADEA, and notified Reap of her right to file a lawsuit against defendant. (Diana Aff. Ex. 6: Dismissal and Notice of Rights dated 12–18–98.) On January 29, 1999, Reap requested that the EEOC issue her a right-to-sue letter on Charge 2 without making a determination of the charge on its merits. (*Id.* Ex. 7: Letter of Alan B. Epstein, Esq. dated 1–29–99.) On February 3, 1999, the EEOC dismissed Charge 2 as requested and issued Reap a right-to-sue letter in connection with that charge. (*Id.* Ex. 11.)

### C. *Procedural History*

Reap filed the instant lawsuit on March 17, 1999. Reap seeks to represent a class "of all older female employees (over the age of 40) of the defendants [sic] who are now or have been employed by the defendant from 1992 to date. Upon information and belief, this class is comprised of approximately 5,000 persons employed at facilities throughout the United States." (Compl. ¶ 12.) Reap alleges that she, and older women as a class, have received differential treatment vis-á-vis younger male employees in connection with the following terms and conditions of employ-

ment: salaries, benefits, merit increases, work assignments, training, performance evaluations, promotions, discipline, lay-offs and/or terminations. (Compl. ¶¶ 1, 13, 35, 38, 43.) Reap further alleges that she, and older women as a class, have been retaliated against for complaining about alleged acts of discrimination. (Compl. ¶¶ 1, 13, 35, 38, 39, 41, 43, 45.)

In the Complaint, Reap seeks the following relief on behalf of herself and members of the proposed class:

(1) a declaratory judgment that defendant has violated the rights of named and class plaintiffs under federal and state law;

(2) reinstatement of plaintiffs to the positions they would have held but for defendant's unlawful acts;

(3) promotions, salary increases, and merit awards due to the named and class plaintiffs;

(4) compensatory damages, including for past and future loss of earnings and benefits, loss of professional growth opportunities, emotional distress, humiliation, loss of self-esteem, loss of life's pleasures, and loss of ability to provide for themselves and their families;

(5) punitive and exemplary damages;

(6) prejudgment interest; and

(7) costs, disbursements, and reasonable attorneys' fees.

(Compl. at 13–14.)

The Complaint seeks this relief pursuant to five different theories: (1) Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, based on sex discrimination; (2) Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.;* (3) Anti–Retaliation Provision of Title VII, 42 U.S.C. § 2000(e)-3(a); (4) Anti–Retaliation Provision of the ADEA, 29 U.S.C. § 623(d); and (5) Anti–Retaliation Provision of the New Jersey Law Against Discrimination, N.J.Stat.Ann. § 10:5–12(d).[1]

The Court entered a Scheduling Order on June 23, 1999. (Order dated 6–23–99.) The Order required the parties to complete dis-

covery on issues relating to class certification by October 29, 1999. (*Id.*) Further, the Order required Reap to file her motion for certification of the putative class on or before December 10, 1999. (*Id.*)

On June 9, 2000, Reap filed the within motion for class certification, requesting that the Court define the class and subclass as follows:

*CLASS*

all employees who are now or have been employed by defendant Continental Casualty Company d/b/a CNA Insurance Companies within the United States from September 5, 1995 to date in non-clerical positions at a job classification level 30 and above, and who have been discriminated against based on their gender in the terms and conditions of their employment, including being treated differently from male employees of equal status, experience, and qualifications regarding, *inter alia,* salary, benefits, performance evaluations, promotions, merit increases and terminations, and/or who have suffered retaliation for filing charges of discrimination based on their gender.

*SUBCLASS*

all female employees over the age of 40 years who are now or have been employed by defendant Continental Casualty Company d/b/a CNA Insurance Companies within the United States from September 5, 1995 to date in non-clerical positions at a job classification level 30 and above, and who have been discriminated against based on their gender in the terms and conditions of their employment, including being treated differently from younger and male employees of equal status, experience, and qualifications regarding, *inter alia,* salary, benefits, performance evaluations, promotions, merit increases and terminations, and/or who have suffered retaliation for filing charges of discrimination based on their age and gender.

(Mot. for Class Action Certif. at 1–2.)

### DISCUSSION

Discriminatory employment practices have been broadly attacked based on theories of

---

**1.** Reap voluntarily withdrew age and gender discrimination claims based on the New Jersey Law Against Discrimination, N.J.Stat.Ann. § 10:5–1 *et*

*seq.* (Mem. & Order filed 10–20–99; Order filed 12–14–99.)

both intentional and unintentional discrimination. Intentional discrimination cases are often referred to as "disparate treatment" cases, whereas unintentional discrimination cases are sometimes referred to as "disparate impact" cases. Most recent Title VII class actions pursue disparate treatment allegations of systemic intentional discrimination. *See* Gary M. Kramer, *No Class: Post–1991 Barriers to Rule 23 Certification of Across–the–Board Employment Discrimination Cases,* 15 Lab. Law. 415, 420 (2000). One reason for this change is that the Civil Rights Act of 1991 (the "1991 Act") provides a right to compensatory and punitive damages only against an employer found to have engaged in unlawful intentional discrimination. *See* 42 U.S.C. § 1981a(a)(1), (b); Kramer, *supra,* at 420.

 The ultimate burden upon the plaintiff in any disparate treatment case is to convince the fact finder that the defendant's actions were motivated by illegal discrimination. *See U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714–17, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). An individual plaintiff can establish a *prima facie* case of intentional discrimination through direct or circumstantial evidence. *See id.* at 714 n. 3, 103 S.Ct. 1478. Most cases of intentional discrimination are proven with circumstantial evidence because direct evidence is often difficult to obtain. *See, e.g., Dillon v. Coles,* 746 F.2d 998, 1003 (3d Cir.1984). Individual claims of intentional discrimination can be proven circumstantially by satisfying the four-part test laid out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The test set forth in *McDonnell Douglas* does not apply, however, in class action or "pattern or practice"[2] suits. In these types of cases, the plaintiff has to show that the defendant had a policy, pattern, or practice of discriminating against a

protected group. In other words, the plaintiff must show that discrimination against the protected group was the defendant's regular practice, rather than an unusual occurrence. *See* Larson, *supra,* at 8.10. In addition, the plaintiff must show that he or she was a member of the protected group.

Plaintiffs have typically depended upon two kinds of circumstantial evidence to establish the existence of a policy, pattern, or practice of intentional discrimination: (1) statistical evidence aimed at establishing the defendant's past treatment of the protected group, and (2) testimony from protected class members detailing specific instances of discrimination. *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 337–39, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 307–08, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); Larson, *supra,* at § 9.03[1].

 In an individual disparate treatment case, the burden of persuasion remains at all times with the plaintiff. However, in a pattern or practice suit or a class action disparate treatment suit, once a plaintiff has established the existence of a discriminatory policy or practice, the burden shifts to the employer to demonstrate that the individual was denied an employment opportunity for lawful reasons. *Int'l Bhd. of Teamsters v. United States,* 431 U.S. at 362, 97 S.Ct. 1843. Similarly, in a disparate impact case, once a plaintiff has demonstrated the disparate impact of a test or other neutral device, usually through statistical evidence, the burden of persuasion shifts to the defendant to persuade the court that the challenged practice is "job related for the position in question and consistent with business necessity." Civil Rights Act of 1991, Pub.L. No. 102–166, § 105 (1991); *see* 1 Lex K. Larson, *Employment Discrimination* § 8.01[3] (2d ed.1975).

---

**2.** A pattern or practice suit requires proof that the treatment challenged as discriminatory was a "standard operating procedure—the regular rather than the unusual practice." *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (footnote omitted); *Cooper v. Fed. Reserve Bank,* 467 U.S. 867, 876 n. 9, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984). Thus, "class-wide allegations of discrimination are commonly referred to as 'pattern or

practice cases.'" *Segar v. Smith,* 738 F.2d 1249, 1266 (D.C.Cir.1984); *see also* Kramer, *supra,* at 420. Such a pattern or practice may be demonstrated through evidence of a pattern of disparate treatment of a number of individuals, or the wide-scale application of tests or other neutral factors having a disparate impact, or both. *See* 1 Lex K. Larson, *Employment Discrimination* § 8.01[3] (2d ed.1975).

The line between a disparate treatment claim and a disparate impact claim is not always clear. Indeed, it is not uncommon for a disparate impact claim and a disparate treatment claim to arise in the same litigation, sometimes on the same facts, and courts have sometimes struggled to maintain the legal distinctions between the two theories in determining which theory or combination of theories is appropriate to the fact situation. *See* Larson, *supra*, at § 9.03[1].

In this case, the language of the Complaint appears to allege solely a disparate treatment claim. (*See, e.g.,* ¶¶ 1, 3.) Thus, the Court will not determine whether the facts of this case support class certification of claims based upon any disparate impact CNA's employment practices may have upon female or older female employees. Instead, the Court will limit its analysis to whether Reap has adequately alleged a basis for certifying a class action based on CNA's alleged practice or policy of discriminating against female or older female employees.

## I. Standard for Approving a Class Action

In *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), the Supreme Court stated that a "Title VII class action, like any other class action, may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of [Federal Rule of Civil Procedure] 23(a) have been satisfied." *Id.* at 161, 102 S.Ct. 2364. In addition, Rule 23(b) defines three different types of class actions, and the party seeking certification must demonstrate that the case falls within one of the Rule 23(b) categories. Fed. R.Civ.P. 23(b). The plaintiff bears the burden of proving that the proposed class action satisfies each of the requirements of Rule 23(a) and one of the prerequisites of Rule 23(b). *See Baby Neal v. Casey,* 43 F.3d 48, 55 (3d Cir.1994).

■ A motion for class certification should not turn on the court's evaluation of the merits of the parties' legal or factual claims. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 140 (3d Cir.1998). However, it may be necessary for the court to analyze the elements of the parties' substantive claims and review facts revealed in discovery before determining whether the requirements for class certification have been satisfied. *See, e.g., Chin v. Chrysler Corp.,* 182 F.R.D. 448, 452 (D.N.J. 1998). As set forth below, Reap has not satisfied the requirements of Rule 23(a) or Rule 23(b). Accordingly, Reap's motion for class certification will be denied.

## II. Reap Has Not Satisfied Rule 23(a)

Rule 23(a) provides:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interest of the class.

Fed.R.Civ.P. 23(a). These four requirements are commonly referred to as numerosity, commonality, typicality, and adequacy of representation. *See, e.g., Falcon,* 457 U.S. at 156, 102 S.Ct. 2364. As set forth below, Reap has not satisfied the commonality and typicality requirements.[3]

---

**3.** "The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements also tend to merge with the adequacy-of-representation require-

ment, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest." *Falcon,* 457 U.S. at 158 n. 13, 102 S.Ct. 2364; *see also Amchem Prods.,* 521 U.S. 591, 626 n. 20, 117 S.Ct. 2231, 138 L.Ed.2d 689 (quoting *Falcon*); *Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 141 (3d Cir.1998). Therefore, we will treat these requirements together.

### A. Commonality and Typicality Requirements

In *Falcon*, the United States Supreme Court "pulled in the reigns" on "across the board" class action attacks on employment discrimination law suits "by insisting on actual, not presumed, compliance with the typicality and commonality provisions of Rule 23." *Goodman v. Lukens Steel Co.*, 777 F.2d 113, 122 (3d Cir.1985), *aff'd,* 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). Reversing certification of a class on the ground that the plaintiff failed to prove commonality and typicality, the *Falcon* Court stated:

> Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims. For [plaintiff] to bridge the gap, he must prove much more than the validity of his own claim.

*Falcon,* 457 U.S. at 157–58, 102 S.Ct. 2364.

In short, the *Falcon* Court "pointed out that a named plaintiff's proof of his personal claim would not necessarily establish that the discriminatory practice was pervasive or was reflected in other employment activities." *Goodman,* 777 F.2d at 122; *see also Falcon,* 457 U.S. at 157–58, 102 S.Ct. 2364. To "bridge the *Falcon* gap," the conceptual gap from an individual claim of discrimination to the existence of a class of persons affected by a company-wide policy or practice of discrimination, a plaintiff must produce evidence of an actual aggrieved class of persons affected by a company-wide policy or practice of discrimination. *See, e.g., Churchill v. IBM,* 759 F.Supp. 1089, 1101 (D.N.J.1991). In addition, a plaintiff is required to produce evidence, usually in the form of affidavits, statistical evidence, or both, tending to show that the individual claims share questions of fact or law with the class claims and that the individual claims are typical of those brought for the class. *See, e.g., id.; Zapata v. IBP, Inc.,* 167 F.R.D. 147, 158 (D.Kan.1996).

Reap argues that CNA's policy of delegating discretionary authority to subordinate managers and supervisors to make employment decisions, such as hiring, assignment, promotion, transfer, performance, salary, and discipline, without sufficient oversight, gives rise to common questions of fact that warrants certification of the proposed company-wide class. (*See, e.g.,* Pl.'s Br. in Supp. at 22.) Reap argues that this policy allows CNA managers and supervisors to improperly use gender and age as criteria in decisions relating to the conditions of employment of women, and particularly older women, in higher job classifications in its workforce. (*See, e.g.,* Pl.'s Reply Br. at 13.)

CNA, on the other hand, argues that class certification is improper because Reap has presented no evidence that she or the class she seeks to represent was subjected to a common set of discriminatory employment practices or policies and because the claims asserted by Reap, individually and on behalf of the class, raise numerous individualized questions that are not amenable to generalized proof. (*See, e.g.,* Def.'s Br. at 1–2.)

Having considered the arguments raised by each of the parties, we believe that CNA has the better argument. Although there is some authority for the proposition that a company's policy of delegating discretionary authority to subordinate managers and supervisors to make employment decisions can constitute a common issue of fact pervading each class member's claim sufficient to satisfy Rule 23(a)'s commonality requirement, *see, e.g., Caridad v. Metro–North Commuter R.R.,* 191 F.3d 283 (2d Cir.1999), *Morgan v. United Parcel Serv. of America, Inc.,* 169 F.R.D. 349 (E.D.Mo. 1996), we decline to follow these cases to the extent they would permit class certification of Reap's disparate treatment claims. Instead, we believe that disparate treatment claims alleging that a company's policy of delegating discretionary employment decisions to local supervisors are not appropriate for class certification absent an allegation that the company intended to use this policy to discriminate against a protected class.

*See Zapata,* 167 F.R.D. 147; *Bostron v. Appfel,* 182 F.R.D. 188 (D.Md.1998); *EEOC v. McDonnell Douglas Corp.,* 17 F.Supp.2d 1048 (E.D.Mo.1998), *aff'd,* 191 F.3d 948 (8th Cir.1999); *Appleton v. Deloitte & Touche, L.L.P.,* 168 F.R.D. 221 (M.D.Tenn.1996); *Zachery v. Texaco Exploration & Prod., Inc.,* 185 F.R.D. 230 (W.D.Tex.1999); *Kramer, supra,* at 435, 443 (opining that only if a plaintiff demonstrates that an employer delegates in order to facilitate discrimination, rather than for legitimate management reasons, should a policy of decentralized decisionmaking provide a sufficient nexus for class certification). Reap does not allege that CNA intended to use its delegation policy to discriminate against women or older women in its work force, that CNA encouraged local managers to discriminate against women or older women, or that CNA condoned such discrimination. In fact, any such discrimination would violate CNA's written policy of non-discrimination. (*See* Samuel Aff. ¶ 10 & Ex. 1 Procedure 1500.) Instead, Reap submits self-created statistical evidence purporting to show that CNA's policy of delegating employment decisions to local supervisors has resulted in such discrimination taking place.[4] Putting aside the unscientific way the statistics were compiled and their

flaws,[5] Reap's statistics do not tend to show that CNA's delegation policy was intended to achieve a company-wide policy of discrimination against women, or older women. At most, these statistics might show that the policy resulted in unintentional discrimination at the local level. If we were to certify Reap's disparate treatment claims, we would be grouping together many unrelated employment decisions made by many individual supervisors against many individual plaintiffs. An analysis of these unrelated decisions would raise numerous individualized questions that are not amenable to generalized proof. *See In re LifeUSA Holding Inc.,* 242 F.3d 136, 145–48 (3d Cir.2001) (holding that district court abused its discretion in certifying class action when claims were too individualized to satisfy Rule 23(a)'s commonality and Rule 23(b)(3)'s predominance requirements); *Alexander v. Gino's,* 621 F.2d 71 (3d Cir.1980) (holding that district court did not abuse its discretion in refusing to certify class action when claims were so individualized that certification was improper). For these reasons, we conclude that Reap has failed to allege facts sufficient to satisfy Rule 23(a)'s commonality and typicality requirements.[6]

4. Reap's statistical evidence purports to show that (1) low numbers of women are employed as officers, managers, and professionals (jobs above grade 30) as compared with the number of women employed as clerical staff (jobs below grade 30), and (2) low numbers of women are employed as officers (jobs grade 91 and above) as compared with the number of women employed as managers, professionals, and clerical staff. (*See* Pl.'s App. Exs. 2, 3, 8.)

5. Although we do not rely upon the problems evident in Reap's statistical evidence as a basis for denying this motion, it is worth pointing some of them out. First, there is no evidence that clerical staff are qualified for positions as officers, managers, and professionals. Second, Reap has submitted no evidence reflecting the percentage of qualified men and women applying for positions with a job grade of 30 and above. Third, Reap's own statistics show that there are more women than men employed in these positions. (*See* Pl.'s App. Ex. 2.) Thus, the statistics do not necessarily reflect a discrepancy between the number of qualified women applying for these positions and the number of women being hired for these positions. In addition, Reap's statistics purporting to show that low numbers of women are being hired as officers as compared with managers, supervisors, and clerical staff

have similar flaws. Although these statistics might be relevant to determine whether women applying for positions as officers are being discriminated against, they are not relevant to determine whether CNA has a policy of discriminating against Reap's proposed class (women employed at positions job grade 30 and above).

6. We also note that Reap failed to produce sufficient evidence, in the form of affidavits from other class members or otherwise, to demonstrate the existence of a class and to show that Reap's claims are typical of the class claims. Reap alleges that she has "provided the names of at least twelve former CNA employees (who have contacted her directly or through counsel) who have alleged that CNA discriminated against them on the basis of their gender and/or age." (Pl.'s Br. at 9.) Reap's description of the claims of these other people is sparse to non-existent. Two of these people were men, and, thus cannot be class members. (*See* Pl.'s App. Ex. 10: Pl.'s Objections and Answers to Def.'s First Set of Interrogs. at 12.) Although Reap provides some information regarding two of the women, by attaching copies of complaints they filed in the United States District Court for the Northern District of Illinois, it is doubtful these women would wish to forego their suits and participate

Having determined that Rule 23(a)'s commonality and typicality requirements have not been satisfied, the Court need not and will not address whether the other two requirements of Rule 23(a), numerosity and adequacy of representation, have been satisfied.

### III. *Reap Has Not Satisfied Rule 23(b)*

Rule 23(b) provides in relevant part:

An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

. . .

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b). Class actions certified under Rule 23(b)(2) are restricted to those cases in which the primary relief sought is injunctive or declaratory in nature. *See Barnes,* 161 F.3d at 142–43. Rule 23(b)(3), on the other hand, was designed for situations in which "class-action treatment is not as clearly called for" as it is in Rule 23(b)(1) and Rule 23(b)(2) situations, but when a class action "may nevertheless be convenient and desirable." Fed.R.Civ.P. 23(b)(3) Advisory Notes to 1966 Amendment. Although the language of Rule 23(b)(3) does not preclude certification when substantial individual damages are available, the Advisory Committee Notes suggest that the drafters of Rule 23(b)(3) primarily had in mind "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *see also Miller v. Hygrade Food Prods. Corp.,* 198 F.R.D. 638, 640–41 (E.D.Pa.2001).

Before passage of the 1991 Act, most Title VII pattern and practice class actions alleging intentional discrimination were certified under Rule 23(b)(2) because the Civil Rights Act of 1964 allowed for very little relief beyond injunctive and declaratory relief. *See, e.g., Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239, 243 (3d Cir.1975). Thus, proposed classes could easily meet the Rule 23(b)(2) standard. *See Miller,* 198 F.R.D. 638, 640–41. Now that the 1991 Act has been enacted, Title VII class action certification is more debatable. *See generally, Allison v. Citgo Petroleum Corp.,* 151 F.3d 402 (5th Cir.1998) (calling into question general propriety of Title VII class actions because of dramatic changes 1991 Act made to Rule 23 analysis).[7]

### A. *The 1991 Act*

Congress amended the Civil Rights Act of 1964 in two significant ways. First, prior to

---

as class members. Finally, Reap's description of the claims of the other eight women is either sketchy or non-existent making it impossible to tell whether any of them qualify as members of the class i.e., whether they were in non-clerical positions at a job classification level 30 and above or were discriminated against on the basis of gender or gender and age. (*See* id.; Reap Dep. at 101–08.) In fact, some of the only evidence offered as to this issue came from CNA. (*See* Samuels Aff. ¶¶ 23–28.) For these reasons, we would deny Reap's motion even if CNA's policy of delegating discretionary authority to subordinate managers and supervisors to make employment decisions constituted a common issue of fact pervading each class member's claim sufficient to satisfy Rule 23(a)'s commonality requirement.

7. We have been unable to find any reported decisions within the Third Circuit in which a Title VII litigation class was certified since the passage of the 1991 Act. *See Miller,* 640–41, 645 n. 4.

passage of the 1991 Act, Title VII cases only allowed for back pay and other equitable remedies. *See Miller,* 198 F.R.D. 638, 641–42. The 1991 Act added the remedies of compensatory and punitive damages for intentional discrimination. 42 U.S.C. § 1981a(a)(1); *see also Miller,* 198 F.R.D. 638, 640–41. Compensatory relief includes relief for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3). Punitive damages are permitted when the employer discriminates "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The 1991 Act caps the sum of compensatory and punitive damages that can be awarded at a maximum of $300,000 per plaintiff. 42 U.S.C. § 1981a(c).

The second change brought about by the 1991 Act is that a plaintiff now has a right to a jury trial when he is seeking compensatory or punitive damages in an intentional discrimination suit. *See* 42 U.S.C. § 1981a(c)(1). Before passage of the 1991 Act, both the liability and the remedy phases of a Title VII case were determined by the court without a jury. *See Miller,* 198 F.R.D. 638, 641–42. This amendment creates potential management concerns as well as Seventh Amendment problems. *See, e.g., Allison,* 151 F.3d at 425; *Miller,* 198 F.R.D. at 641–42, 644–45.

As set forth below, Reap has not satisfied the requirements of Rule 23(b)(2) or (b)(3).

**B.** *Reap Has Not Satisfied Rule 23(b)(2)*

■■■■ As set forth above, class actions certified under Rule 23(b)(2) are restricted to those cases where the primary relief sought is injunctive or declaratory in nature. *Barnes,* 161 F.3d at 142–43. Furthermore, Rule 23(b)(2) classes must be cohesive because unnamed members of the class are bound by the decision with no opportunity to opt-out.[8] *See id.* at 142. When a class suffers from a common injury and seeks class-wide relief, there is a presumption of cohe-

sion. *See Allison,* 151 F.3d at 413; *Miller,* 198 F.R.D. 638, 641–42. In contrast, when a class seeks monetary relief, the class becomes less cohesive because assessing these damages often necessitates an examination into individual claims. *Id.*

■■■■ The Court of Appeals for the Third Circuit has not established a test for determining whether a request for injunctive or declaratory relief should be deemed primary for purposes of Rule 23(b)(2) when it is combined with a request for monetary relief. *See Miller,* 198 F.R.D. 638, 641–42. Nor do the Rules of Civil Procedure provide any guidance. *Id.* In *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402 (5th Cir.1998), the Fifth Circuit Court of Appeals created such a test, holding that "monetary relief predominates in (b)(2) class actions unless it is incidental to requested injunctive or declaratory relief." *Id.,* 151 F.3d at 415. Incidental damages are those "that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief." *Id.* A court should consider three factors in determining whether damages are "incidental" for purposes of this test: (1) whether such damages are of a kind to which class members would be automatically entitled, (2) whether such damages can be computed by "objective standards," and not standards reliant upon "the intangible, subjective differences of each class member's circumstances," and (3) whether such damages would require additional hearings to determine. *Id.* Thus, the standard enunciated in *Allison* balances the efficiencies of a class-wide injunctive action against the due process requirements of individualized claims for damages: "[A]s the claims for individually based damages begin to predominate, the presumption of cohesiveness decreases while the need for enhanced procedural safeguards to protect the individual rights of class members increases." *Id.* at 413. We believe that the test set forth in *Allison* is a good one and, like many courts to consider the issue, we will adopt it. *See Lemon v. Int'l Union of Operating Eng'rs.,* 216 F.3d 577, 580–81 (7th Cir.2000) (applying *Allison* test to proposed Title VII class);

---

8. In fact, because of this inability to opt out, a Rule 23(b)(2) class may require more cohesive-ness than a Rule 23(b)(3) class. *Barnes,* 161 F.3d at 142–43.

*Miller,* 198 F.R.D. 638, 641–42 (same); *Adams v. Henderson,* 197 F.R.D. 162, 171 (D.Md.2000) (same); *Robinson v. Metro–North Commuter R.R.,* 197 F.R.D. 85 (S.D.N.Y.2000) (same); *Robinson v. Sears, Roebuck & Co.,* 111 F.Supp.2d 1101, 1126–27 (E.D.Ark.2000) (same); *Ramirez v. DeCoster,* 194 F.R.D. 348, 352 (D.Me.2000) (same); *Faulk v. Home Oil Co.,* 184 F.R.D. 645, 661, 663 (M.D.Ala.1999) (same). *But see Smith v. Texaco, Inc.,* 88 F.Supp.2d 663, 679–80 (E.D.Tex.2000) (distinguishing *Allison*); *Hoffman v. Honda of Am. Mfg., Inc.,* 191 F.R.D. 530, 534–35 (S.D.Ohio 1999) (same); *Warnell v. Ford Motor Co.,* 189 F.R.D. 383, 389 (N.D.Ill.1999) (same); *McClain v. Lufkin Indus., Inc.,* 187 F.R.D. 267, 282 (E.D.Tex. 1999) (disagreeing with *Allison*).

In applying the *Allison* test, we find that Reap's prayer for relief cannot be assessed by objective standards and would require individual hearings. *See Allison,* 151 F.3d at 417. Reap's class claims allege across-the-board discrimination in areas of salaries, benefits, merit increases, work assignments, training, performance evaluations, promotions, discipline, lay-offs, terminations, and retaliation. (Compl. ¶¶ 1, 13, 35, 38, 39, 41, 43, 45.) Reap does not allege that each class member was affected by the alleged discriminatory practices in the same manner. Thus, subjective standards will have to be used to determine the extent of damages incurred by the class members because they were subjected to different forms of discrimination in different divisions by different supervisors for varying durations of time. Assuming arguendo that CNA operated in a discriminatory manner, calculating compensatory and punitive damages, as opposed to simply back pay, for thousands of class members would prove to be quite an individualized task. In some cases, the family members will have been affected, while in other cases, such a probe will be unnecessary. These concerns represent only a sampling of the individualized nature of appraising damages. *See Miller,* 198 F.R.D. 638, 642–43. Thus, we conclude that in the present action, monetary relief predominates and precludes certification under Rule 23(b)(2).

### C. *Reap Has Not Satisfied Rule 23(b)(3)*

As set forth above, to qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites:

> Common questions must predominate over any questions affecting only individual members; and class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy.

*Amchem,* 521 U.S. at 615, 117 S.Ct. 2231.

> In adding "predominance" and "superiority" to the qualification-for-certification list, the Advisory Committee sought to cover cases "in which a class action would achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."

*In re LifeUSA,* 242 F.3d 136, 143–45 (quoting *Amchem,* 521 U.S. at 615, 117 S.Ct. 2231). We will now address each of these two factors.

#### 1. *Predominance*

The predominance requirement incorporates the commonality requirement of Rule 23(a). *Id.* Thus, even if Rule 23(a)'s commonality requirement is satisfied, predominance may not be, as it is more demanding. *Id.* As we have already held in connection with our analysis of Rule 23(a), the issue of CNA's potential liability requires many individualized inquiries unique to each class member. Even if this inquiry did share common questions of fact or law, the additional individualized inquires that would have to be undertaken on the issue of damages make clear that individual issues predominate over any common ones.

#### a. *Liability Issues*

As set forth above, Reap's class claims seek to group together many unrelated employment decisions made by many individual supervisors against many individual plaintiffs without alleging that CNA intended to use its delegation policy to discriminate against women or older women in its work force, that CNA encouraged local managers

to discriminate against women or older women, or that CNA condoned such discrimination. Instead, Reap merely alleges that CNA's policy of delegating employment decisions to local supervisors has resulted in such discrimination taking place. Thus, in order to determine whether a class member was subjected to discrimination, the fact finder would have to make individualized inquiries regarding the nature of each class member's claim to determine whether she was the victim of intentional discrimination. These individualized fact issues would predominate during the liability phase of the trial.

The individualized legal issues are also likely to predominate over common ones because the Court would probably be required to examine the law of a number of jurisdictions. One of the claims remaining in the case is based upon the Anti–Retaliation Provision of the New Jersey Law Against Discrimination, N.J.Stat.Ann. § 10:5–12(d). The Court must presume, however, that this law would not govern the employment relationship of those class members who are or were employed outside New Jersey. There is no reason to think that these class members would not wish to assert similar claims based on the law of their home states. If we were to permit such class members to assert such claims, then the individualized legal determinations would likely outweigh the common ones. Moreover, if we did not allow other class members to assert such claims, then as described in greater detail below, class certification would be an inferior method to adjudicate their claims.[9]

### b. *Damages Issues*

■ The type and amount of damages each class member would be entitled to in the damages phase of the case depends for the most part upon the same individualized issues of fact that predominate in connection with the liability phase of the case. For example, Reap does not allege that each class member was affected by the alleged discriminatory practices in the same manner. Thus, subjective standards will have to be used to

determine the extent of damages incurred by the class members because they were subjected to different forms of discrimination in different divisions by different supervisors for varying durations of time. Assuming arguendo that CNA operated in a discriminatory manner, calculating compensatory and punitive damages, as opposed to simply back pay, for thousands of class members would prove to be quite an individualized task. *See* discussion at pp. 27–28, *supra*. Thus, we conclude that individual issues would predominate over common ones during the damages phase of the trial.

### 2. *Superiority*

■ Having determined that the class does not satisfy the "predominance" requirement of Rule 23(b)(3), we will not dwell at length on the superiority requirement of the rule, inasmuch as failure to meet any of the requirements of Rules 23(a) and (b) precluded certification of a class. We will, however, discuss a few additional reasons why this case is not appropriate for class certification.

First, the highly individualized nature of the determination of disparate treatment and damages in this case makes the interest of individual class members in individually controlling the prosecution of their claim, rather than having it controlled by class representatives, a very strong one. *See* Fed.R.Civ.P. 23(b)(3)(A); *Robinson,* 197 F.R.D. at 89. Indeed, two of the class members identified by Reap have already filed their own law suits. This is especially true in a case such as this in which Reap is pursuing state law claims on behalf of herself but not on behalf of class members with claims that arose outside of New Jersey. *See* note 9, *supra*.

■ Second, this is not a negative value suit. As the Supreme Court stated in *Amchem,* "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."

---

9. The fact that Reap did not assert such claims on behalf of the other class members demonstrates that her claims may not be typical of other class members and that she may not be an adequate representative of the interests of class members who were employed outside New Jersey. *See* Fed.R.Civ.P. 23(a).

521 U.S. at 617, 117 S.Ct. 2231. Indeed, "the most compelling rationale for finding superiority in a class action [is] the existence of a negative value suit." *Allison,* 151 F.3d at 420. Thus, a class action is not warranted when proposed class members have both the incentive and the ability to protect their own interests. *Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.,* 149 F.R.D. 65, 74 (D.N.J. 1993). Here, individual class members have an interest in prosecuting their own actions because of the availability of significant money damages and full reimbursement of attorneys fees. *See Allison,* 151 F.3d at 420. In fact, at least two of the potential class members identified by Reap have already filed actions.

Finally, the proposed class action would be unmanageable. The individualized nature of the evidence required to prove each of the approximately 5000 class members' claims would cause a very complicated and prolonged trial. This approach would have to be repeated again if the trial were bifurcated into liability and damages stages. Another complication would arise if the Court were required to consider state law claims from a number of jurisdictions. *See* note 9, *supra,* and accompanying text. The above manageability problems would be further complicated by the existence of a jury. Under the Seventh Amendment to the United States Constitution, the jury who hears the evidence in the liability phase of the case might also be required to hear the evidence in the damages phases. *See Allison,* 151 F.3d at 419, 422–25. As a result, class resolution would be too prolonged and complicated, and would not be superior to other available methods for the fair and efficient adjudication of this case.[10]

### CONCLUSION

As set forth above, Reap has failed to satisfy the requirements for class certifica-

tion of this case for a number of separate and independent reasons. First, Reap has failed to satisfy the commonality and typicality requirements of Federal Rule of Civil Procedure 23(a) because Reap's disparate treatment claims attacking CNA's policy of delegating discretionary employment decisions to local supervisors are not appropriate for class certification absent an allegation that the company intended to use this policy to discriminate against a protected class. In addition, Reap has failed to satisfy the alternative requirements of Rule 23(b)(2) or Rule 23(b)(3). Rule 23(b)(2) has not been satisfied because the request for damages predominates over the request for injunctive and declaratory relief. Rule 23(b)(3) has not been met because individual issues predominate over common ones and class adjudications of the claims are inferior to alternate methods of adjudication. Accordingly, Reap's motion for class certification will be denied.

---

10. In her reply brief, Reap seeks to amend her motion to include a request for alternative certification of the subclass of females over the age of 40 under the provisions of Section 16(b) of the Fair Labor Standards Act. (*See* Pl.'s Reply Br. in Supp. of Her Mot. for Class Certification at 2.) "[I]t is improper for a party to present a new argument in his or her reply brief." *United*

*States v. Medeiros,* 710 F.Supp. 106, 110 (M.D.Pa.), *aff'd,* 884 F.2d 75 (3d Cir.1989); *Cf. United States v. Boggi,* 74 F.3d 470, 478 (1996) (holding that Courts of Appeals will generally not consider arguments raised on appeal for first time in reply brief). CNA has not had the opportunity to adequately respond to this argument and we choose not to consider it.